# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMANDA LOPEZ-FRAUSTO,<br><br>             Plaintiff,<br><br>    v.<br><br>NANCY A. BERRYHILL,<br>Acting Commissioner of Social Security,<br><br>             Defendant. | Case No.: 1:17-cv-1106-JLT<br><br>ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF DEFENDANT, NANCY A. BERRYHILL, ACTING COMMISSIONER OF SOCIAL SECURITY, AND AGAINST PLAINTIFF AMANDA LOPEZ-FRAUSTO |

Amanda Lopez-Frausto asserts she is entitled to a period of disability, disability insurance benefits, and supplemental security income under Titles II and XVI of the Social Security Act. Plaintiff argues the administrative law judge erred in evaluating the record and seeks review of the decision denying her applications for benefits. Because the ALJ identified legally sufficient reasons for discounting the credibility of Plaintiff's subjective complaints, the administrative decision is **AFFIRMED**.

## PROCEDURAL HISTORY

In August 2013, Plaintiff filed her applications for benefits, alleging disability beginning on March 2, 2013. (Doc. 9-6 at 2, 10) The Social Security Administration denied the applications at the initial level and upon reconsideration. (*See generally* Doc. 9-4; Doc. 9-3 at 21) After requesting a hearing, Plaintiff testified before an ALJ on March 4, 2016. (*See* Doc. 9-3 at 21, 37) The ALJ

determined Plaintiff was not disabled and issued an order denying benefits on March 10, 2016. (*Id.* at 21-30) When the Appeals Council denied Plaintiff's request for review on June 19, 2017 (*id.* at 2-5), the ALJ's findings became the final decision of the Commissioner of Social Security.

## **STANDARD OF REVIEW**

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act. When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error. 42 U.S.C. § 405(g). The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)). The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## **DISABILITY BENEFITS**

To qualify for benefits under the Social Security Act, Plaintiff must establish she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). The burden of proof is on a claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990). If a claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial

gainful employment. *Maounois v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

## **ADMINISTRATIVE DETERMINATION**

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 404.1520, 416.920(a)-(f). The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity ("RFC") to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level. *Id.* The ALJ must consider testimonial and objective medical evidence. 20 C.F.R. §§ 404.1527, 416.927.

**A.    Medical Background and Relevant Opinions[1]**

Plaintiff reported she "had back pain with spasms since 2001 while she was in high school." (Doc. 9-9 at 53) She stated she injured her back when in a car accident, and "received chiropractic care but felt that her back became worse and not better."[2] (*Id.*) In November 2001, Dr. Joseph Parravano determined a CT scan of Plaintiff's lumbar spine showed the disks from the L3 to S1 levels were "within normal limits, with no significant broad-based bulging to suggest thecal sac distortion or nerve root compression." (*Id.* at 2) Dr. Parravano opined "a slight convexity of the spine to the right… may reflect spasm and/or positioning." (*Id.* at 3) In addition, he found a "suggestion of spondylolysis at L5," which was "not seen on the plain films, and [was] more clearly delineated on the CT scan." (*Id.*) According to Dr. Parravano, there was "[n]o significant disk disease" in Plaintiff's pine. (*Id.*)

In May 2013, Plaintiff returned to Central Valley Pain Management, where Dr. Janardhan Grandhe noted she "was last seen more than a year ago on February 11, 2012," following a joint injection that provided "50% relief for three months." (Doc. 9-11 at 56) Plaintiff told Dr. Grandhe that she had prescriptions for Naproxen and Vicodin, but she was not taking the Vicodin. (*Id.*) She also

---

[1] Plaintiff's sole argument is that the ALJ erred in assessing the credibility of her subjective complaints. (*See generally* Doc. 13) In support of this assertion, she identifies only a few pages of medical evidence that she believes is relevant. (*See id.* at 5-16) Nevertheless, the Court has reviewed the entirety of the medical record, and this summary addresses evidence discussed by Plaintiff, Defendant, and the ALJ.

[2] Notably, Plaintiff also reported that her "back pain started back in 1997 for no particular reason" and there "were no injuries to the back." (Doc 9-10 at 99)

3

told Dr. Grandhe that her "pain level decreased from 9-10/10 down to 4-5/10 but it [was]… back up at 9-10/10." (*Id.*) Dr. Grandhe determined Plaintiff had positive trigger points in the thoracic and lumbar spines, rigidity, and guarding. (*Id.*) Her straight leg test was negative. (*Id.*) Dr. Grandhe gave Plaintiff a TENS unit to use "on the lumbar area twice a day for 15 minutes each time." (*Id.*)

Later in May 2013, Dr. Matthew Easton treated Plaintiff for back pain. (Doc. 9-10 at 44) Plaintiff told Dr. Easton that her TENS unit was helping and she had "[s]ome improvement" with her back pain. (*Id.*) She also reported that she was using Soma and Naprosyn intermittently. (*Id.*) Dr. Easton directed Plaintiff to continue home therapy and using the TENS unit. (*Id.* at 44)

In July 2013, Dr. Easton noted Plaintiff had received a spinal injection approximately two weeks before, and had "mild improvement." (Doc. 9-10 at 40) Plaintiff said she continued to take Naprosyn and Vicodin intermittently. (*Id.*) Upon examination, Dr. Easton found Plaintiff had a "moderately reduced" range of motion and muscle spasm in the lumbar spine. (*Id.* at 41)

On August 14, 2013, Dr. Grandhe reviewed an x-ray of Plaintiff's thoracic spine, and found "minimal thoracic degenerative disc disease and osteophyte formation." (Doc. 9-9 at 6) Plaintiff reported having "low back pain with radicular pain into bilateral legs to toes, left greater than right … with associated numbness and tingling." (*Id.*) Plaintiff described her pain as a 3 to 4/5 in her low back. (*Id.* at 7) Plaintiff said that she "use[d] a TENS unit with good relief," and reported she had "50% relief lasting one week" following a bilateral facet joint block. (*Id.* at 6) Dr. Grandhe observed that Plaintiff had positive trigger points in the thoracic spine "with taut bands and jump signs," as well as "[r]igidity, guarding, and paraspinal tenderness" in the lumbar spine. (*Id.*) He indicated that he would "advise the primary care physician to continue pain medications as currently prescribed as appropriate relief seem[ed] to be established." (*Id.*)

Later in August 2013, Plaintiff visited the emergency department of Kaweah Delta, reporting "worsening back pain." (Doc. 9-9 at 13) Upon examination, Plaintiff did not exhibit any tenderness to palpation in her neck or back. (*Id.* at 14) The hospital performed an MRI on Plaintiff's lumbar spine on August 20, 2013. (*Id.* at 39) Dr. Robert Clutson determined Plaintiff had "slight disc desiccation and very mild posterior broad based disc bulge" at the L4-5 level. (*Id.*) Dr. Cluston also found "[p]ossible minimal impression upon the left L5 nerve root secondary to slight asymmetric disc bulge at

[that] level." (*Id.*) At a follow-up with Dr. Easton, Plaintiff reported that she was "probably 60 to 70% better," with "[n]o numbness or tingling." (Doc. 9-10 at 61)

Plaintiff told Dr. Easton that her back pain was approximately "30% better" in September 2013. (Doc. 9-10 at 30) She reported that she took two pills of Vicodin and one Valium per day. (*Id.*) Dr. Easton observed that Plaintiff had a muscle spasm in the lumbar spine and a "moderately reduced" range of motion upon examination. (*Id.* at 31)

In December 2013, Plaintiff was referred to physical therapy, which she began on January 3, 2014. (Doc. 9-9 at 44, 47) At her initial session, Plaintiff described her pain as a "4/10" at best and "10/10" on average. (*Id.*) Plaintiff demonstrated "mild to moderate myotension throughout her back," as well as "a significantly weak core with impaired flexibility." (*Id.* at 54) Plaintiff was instructed to perform activities such as ankle pumps, hip and knee bends, leg kicks, and stretching. (*Id.* at 44-46) Plaintiff continued with physical therapy through February. (*Id.* at 48)

On February 10, 2014, the physical therapist noted Plaintiff described her pain as an "8/10." (Doc. 9-9 at 48) The therapist observed Plaintiff "continue[d] to have difficulty [with] her low back pain although her quality of movement [was] better than it [was]." (*Id.*)

Plaintiff had an MRI on her lumbar spine in June 2014. (Doc. 9-9 at 66) Dr. Javier Beltran determined Plaintiff had an "annular bulge with posterior annular tear" at the L4-5 level. (*Id.*) He also suspected "bilateral spondylolysis" at the L5 level. (*Id.*) Dr. Quattrocchi later reviewed the imaging and opined "there were minimal degenerative changes" at the L3-4 level and "a pars defect with mild to moderate foraminal stenosis" at the L5-S1 level. (Doc. 9-13 at 44)

In October 2014, Dr. Douglas Kerr evaluated Plaintiff for back pain when she visited the hospital. (Doc. 9-9 at 61) Dr. Kerr determined Plaintiff's musculoskeletal examination was negative, without swelling or deformities. (*Id.* at 61, 63)

In December 2014, Dr. Stephanie Voyles noted Plaintiff reported her back pain was "severe," and occurred persistently, though the "problem [was] fluctuating." (Doc. 9-13 at 11) Plaintiff reported her symptoms were "relieved by pain meds/drugs." (*Id.*) In addition, Plaintiff said she had foot pain that occurred "intermittently and [was] worsening." (*Id.*) Dr. Voyles observed that Plaintiff walked with an antalgic gait and "no assistive device." (*Id.* at 15)

The following month, Plaintiff continued to report her back pain, which radiated to her right foot, was "relieved by pain meds/drugs." (Doc. 9-13 at 6) Dr. Voyles determined Plaintiff exhibited tenderness in the thoracic spine and lumbar spine. (*Id.* at 8) Dr. Voyles indicated she would prescribe a walker because Plaintiff reported "needing assistance to ambulate even inside her house." (*Id.* at 9)

In February 2015, Plaintiff visited the emergency room after a "flare of severe pain," which was alleviated when she received pain medication. (*See* Doc. 9-12 at 56) She again told Dr. Voyles that her the severity of her pain was "relieved by pain meds/drugs." (*Id.*)

Plaintiff was referred to UCSF Neurosurgery and was evaluated by Dr. Keith Quattrocchi in March 2015. (Doc. 9-13 at 42) Plaintiff described "pain in the lower lumbar spine with radiation of pain down into the left buttock." (*Id.*) She said she had "gained a great deal of weight recently," and at that time weighed 255 pounds. (*Id.*) Dr. Quattrocchi determined Plaintiff had "lumbar degenerative changes with lateral recess stenosis at L4-5 and foramina stenosis with a pars defect at L5-S1." (*Id.* at 44) He recommended Plaintiff "take an aggressive approach with regards to weight loss," and agreed to return to Dr. Quattrocchi once she reached 200 pounds "if she continue[d] to have low back pain." (*Id.*) In that event, Dr. Quattrocchi opined the "case would likely proceed with an L4-5 and L5-S1 instrumented and interbody fusion." (*Id.*)

In September 2015, Plaintiff told Dr. Hugh Yang that taking Hydrocodone helped with her back pain, and that she had "not been takin[g] baclofen, gabepentin, and naproxen much." (Doc. 9-12 at 26) She received a referral to see Dr. Ky at Advanced Pain Solutions. (*Id.* at 30)

Dr. Dale Van Kirk performed a comprehensive orthopedic evaluation on October 15, 2015. (Doc. 9-10 at 99) Plaintiff told Dr. Van Kirk that "she stopped working three years ago because of chronic back pain." (*Id.*) She also reported that she had plantar fasciitis, and injections into the plantar fascia area would "help[] for about three weeks." (*Id.* at 99-100) However, Plaintiff indicated that "[f]ar and away the main physical reason why she [was] not gainfully employed [was] chronic back pain." (*Id.* at 100) Dr. Van Kirk noted that Plaintiff used a lumbar corset, which was removed for the examination, and "a lightweight walker with a seat on it to help reduce her pain." (*Id.* at 100, 101) He observed Plaintiff sat "comfortably in the examination chair, [got] up and out of the chair, walk[ed] around the examination room without the use of her walker or any assistance and [got] on and off the

table without too much trouble." (*Id.* at 101) However, Plaintiff "needed the assistance of her husband to get up and off the bench." (*Id.*) Dr. Van Kirk observed that Plaintiff "was able to squat about 1/3 of the way but could not continue because of back pain." (*Id.*) Plaintiff's muscle strength was "[n]ormal, 5/5, in the upper and lower extremities bilaterally, including grip strength." (*Id.* at 102)

Dr. Van Kirk completed a residual functional capacity assessment, and determined that Plaintiff "should be able to stand and walk cumulatively for six hours out of an eight-hour day" and "sit without limitations in an eight-hour day." (Doc. 9-10 at 103) Dr. Van Kirk opined Plaintiff did "not need to use a walker on a regular basis," though she would "perhaps… benefit by carrying a collapsible cane with her when she is out and about for even and uneven terrain for times when she feels unsteady." (*Id.*) He found Plaintiff could lift and carry "20 pounds occasionally and 10 pounds frequently, limited because of chronic low back pain." (*Id.*) Dr. Van Kirk determined that Plaintiff was "limited to only occasional postural activities," including climbing stairs, ramps, ladders, and scaffolds; stooping; and kneeling. (*Id.* at 103, 96) Dr. Van Kirk indicated Plaintiff should never crouch or crawl. (*Id.* at 96)

In December 2015, Plaintiff visited Advanced Pain Solutions, where Dr. Paul Ky evaluated Plaintiff. (Doc. 9-11 at 29) Plaintiff reported her current pain level was 5/10. (*Id.*) Dr. Ky also noted Plaintiff described "numbness bilateral lower limbs, tingling bilateral lower limbs, weakness to the left lower limb, difficulties with activities of daily living, difficulty walking/running, headaches, loss of memory, and poor concentration." (*Id.* at 29-30) She stated her symptoms were alleviated by "changing position often, lying down on her bilateral sides, medication(s) and [an] ice pack." (*Id.* at 30) Dr. Ky determined Plaintiff's lumbar range of motion was limited by 40% with flexion, 50% with extension, 30% with right rotation, and 40% with left rotation. (*Id.* at 32) Dr. Ky indicated he would "proceed with lumbar facet injection" to address Plaintiff's back pain. (*Id.* at 33)

Later in December 2015, Dr. Yang observed that Plaintiff was walking with a normal gait, and her musculoskeletal exam was normal. (Doc. 9-12 at 6) He directed Plaintiff to follow Dr. Ky's treatment plan. (*Id.*)

**B.    Pain Questionnaire**

Plaintiff completed a pain questionnaire on September 21, 2013. (Doc. 9-7 at 14-17) She indicated that her usual daily activities included "[l]imited walking distance [and] light lifting." (*Id.* at

7

17) Plaintiff noted she was able to shop and drive, but was "limited to approximately 1 mile." (*Id.*) She estimated that she was "able to walk 50 yards outside [the] home," "stand 10 minutes at a time," and "sit 15 minutes at a time." (*Id.*)

**C.      Administrative Hearing Testimony**

Plaintiff reported that she lived with her husband and two children, who were eleven and five years old. (Doc. 9-3 at 43) She stated both she and her husband took care of the children, and she did "whatever [she] can do at home with them." (*Id.*) Plaintiff testified that her husband cooked; he and their eleven-year-old child did the laundry; and Plaintiff's husband and mom did the housekeeping. (*Id.* at 43-44)

Plaintiff testified that she was "in constant pain," which increased when she had spasms in her "lower back, down [her] left leg." (Doc. 9-3 at 44) She reported she took a spasm medication and hydrocodone for pain, although she would "sometimes change those back and forth with tramadol." (*Id.*) Plaintiff said the spasm and pain medication made her "tired and sleepy and nauseas [sic]," and she tried "not to take too many" because it made her feel dizzy and nauseous. (*Id.* at 44-45) In addition, Plaintiff stated she received steroid injections for her back pain. (*Id.*)

She reported her doctor told her to lose weight, but she had lost "only about nine pounds." (Doc. 9-3 at 45) Plaintiff believed her steroid injections were "not helping [her] lose weight at all." (*Id.*) Plaintiff stated that she watched what she ate and had "stopped drinking sodas … for at least over a month." (*Id.*) She said it was "really difficult when [she] cannot exercise and move around" because she was "not mobile." (*Id.*) She stated a walker was prescribed by her previous doctor, and using a walker gave her the "mobility to go out with [her kids] and to sit down and watch them play," but she could not "be up and running" or do things "the way [she] used to." (*Id.* at 46-47)

Plaintiff said that "to just get up out of the bed…[took] about an hour," due to her pain, and she spent "like, 8 or 9 hours" each day lying down. (Doc. 9-3 at 47) When asked to describe her typical day, Plaintiff stated:

> I get up. I take my medications. Help dress my, my 5 year old. My husband drives him to school. I wait for her to get home. I help her with her homework. And by that time, about 3:00, my son gets home. He either gets picked up by my husband or my mom. And I help him with his homework. I make sure they're ready for school the next day.

(*Id.* at 44) She explained that she helped "[b]y preparing their homework and their clothes," so [they were] not running late the next day." (*Id.*) She said she went out with her children when she could, but felt like she was "left out a lot of times." (*Id.* at 45-46)

Plaintiff testified she had not worked or earned any money since 2013. (Doc. 9-3 at 42) The ALJ observed that Plaintiff's records indicated earnings in the second quarter of 2013—after the alleged disability date of March 2, 2013—from Pizza Hut and Dinuba Unified School District. (*Id.* at 42-43) Plaintiff reported these were her "last jobs," and she did not believe she worked after March 2, 2013. (*Id.*) She stated, "Once I was disabled from my doctor, I did not go back to work." (*Id.* at 43) Plaintiff stated working for the school district was her "dream job" but she "could not walk anymore" due to back and foot pain. (*Id.* at 46) She explained she missed work "[a]t least once or twice or week," and was told by the principal that if she could not do the job, she would be let go. (*Id.*)

**D.     The ALJ's Findings**

Pursuant to the five-step process, the ALJ determined Plaintiff did not engage in substantial gainful activity after the application date of March 2, 2013. (Doc. 9-3 at 23) At step two, the ALJ found Plaintiff's severe impairments included: "back pain and obesity." (*Id.* at 24) At step three, the ALJ determined Plaintiff did not have an impairment, or combination of impairments, that met or medically equaled a Listing. (*Id.*) Next, the ALJ determined:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR. 404.1567(b) and 416.967(b) except the claimant can occasionally climb stairs, ramps, ladders, and scaffolds; stoop; and kneel; and never crouch or crawl.

(*Id.* at 25) Based upon this RFC, the ALJ concluded Plaintiff was "capable of performing past relevant work as a waiter and hospital admitting clerk." (*Id.* at 29) Therefore, the ALJ concluded Plaintiff was not disabled "as defined by the Social Security Act, from March 2, 2013, through the date of [the] decision." (*Id.* at 29)

## DISCUSSION AND ANALYSIS

Appealing the decision to deny his application for benefits, Plaintiff asserts the ALJ did not identify legally sufficient reasons to reject the credibility of her subjective complaints. (Doc. 13 at 6-15) Defendant argues, that the ALJ identified "numerous, valid reasons for concluding that Plaintiff's testimony was not credible." (Doc. 16 at 6)

### A. Limitations to which Plaintiff Testified and the RFC

As an initial matter, the Court notes that Plaintiff fails to identify what subjective complaints and limitations addressed in her testimony that she believes should have been incorporated into the residual functional capacity by the ALJ. Previously, the Ninth Circuit "reject[ed] any invitation to find that the ALJ failed to account for [the claimant's] injuries in some unspecified way" where the claimant failed to "detail what other physical limitations" he believed should have been included in the RFC. *See Valentine v. Astrue,* 574 F.3d 685, 692 n.2 (9th Cir. 2009).

Likewise, district courts throughout the Ninth Circuit determined failure to identify specific limitations that should have been incorporated into a residual functional capacity is fatal to a claimant's challenge of the ALJ's findings. *See, e.g.*, *Juarez v. Colvin*, 2014 U.S. Dist. LEXIS 37745 at *15 (CD Cal. Mar. 20, 2014) (rejecting an argument that the ALJ erred in evaluating the claimant's limitations where she had "not specified or proffered evidence of any additional limitations from the arthritis that the ALJ failed to consider"); *Hansen v. Berryhill,* 2018 U.S. Dist. LEXIS 19489 (W.D. Wash. Feb. 6, 2018) ("Although Plaintiff argues that the ALJ erred in failing to account for the limitations caused by his ADHD in the RFC assessment, he does not identify which limitations were erroneously omitted, and has thus failed to state an allegation of error"); *Thomas v. Comm'r of SSA*, 2015 U.S. Dist. LEXIS 99338 at *21 (Dist. Or. Jul 30, 2015) ("Plaintiff does not cite to evidence of physical limitations stemming from these impairments beyond those already listed in his RFC. Without more specific information on how these conditions hinder Plaintiff, the Court declines to find the ALJ failed to account for Plaintiff's limitations").

The Court is unable to speculate as what limitations Plaintiff believes the ALJ should have incorporated into the RFC based upon Plaintiff's hearing testimony. *See Valentine,* 574 F.3d at 692 n.2; *see also Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) (noting the Court "has repeatedly admonished that [it] cannot 'manufacture arguments for an appellant'"). Accordingly, Plaintiff fails to identify any error with the residual functional capacity and this argument is waived.

### B. ALJ's Credibility Analysis

In evaluating a claimant's credibility, an ALJ must determine first whether objective medical

evidence shows an underlying impairment "which could reasonably be expected to produce the pain or other symptoms alleged." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991)). Second, if there is no evidence of malingering, the ALJ must make specific findings as to the claimant's credibility by setting forth clear and convincing reasons for rejecting his subjective complaints. *Id.* at 1036; *see also Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F.3d 1155, 1160 (9th Cir. 2008).

Factors that may be considered by an ALJ in assessing a claimant's credibility include, but are not limited to: (1) the claimant's reputation for truthfulness, (2) inconsistencies in testimony or between testimony and conduct, (3) the claimant's daily activities, (4) an unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment, and (5) testimony from physicians concerning the nature, severity, and effect of the symptoms of which the claimant complains. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989); *see also Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002) (an ALJ may consider a claimant's reputation for truthfulness, inconsistencies between a claimant's testimony and conduct, and a claimant's daily activities when weighing the claimant's credibility).

Plaintiff asserts "the ALJ failed to articulate sufficient reasons to find Lopez-Frausto not credible." (Doc. 13 at 6) According to Plaintiff, "the ALJ simply sets forth the oft rejected boilerplate language numerous courts have rejected as boilerplate." (*Id.* at 9, citing *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012)). Plaintiff argues also that "it appears, without specifically articulating, that the ALJ simply rejects Lopez-Frausto's testimony based on a belief that the testimony is not credible because it lacks support in the objective medical evidence." (*Id.*) On the other hand, Defendant argues the ALJ properly considered several factors—including factors not acknowledged or challenged by Plaintiff— to evaluate her credibility. (Doc. 16 at 5-12)

Specifically, the ALJ determined Plaintiff's "impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." (Doc. 9-3 at 25) The ALJ continued: "In making this determination, the undersigned

considered the credibility factors outlined in SSR 96-7p."[3] (*Id.*) The ALJ addressed Plaintiff's level of activity, conflict with the medical record, the treatment she received, candor at the hearing, conflicting statements, and his own observations at the hearing. (*See id.* at 25-27)

1. Use of "boilerplate" language

In *Bjornson v. Astrue*, as Plaintiff observes, the Seventh Circuit criticized ALJs who include the following language in their decisions: "[A]fter considering the evidence of record, the undersigned finds that claimant's medically determinable impairments would reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." *Id.*, 671 F.3d at 645. The court explained this was "meaningless boilerplate" because "[t]he statement by a trier of fact that a witness's testimony is 'not *entirely* credible' yields no clue to what weight the trier of fact gave the testimony. *Id.* (quoting *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) (emphasis in original)). Further, the court explained: "Such boilerplate language fails to inform us in a meaningful, reviewable way of the specific evidence the ALJ considered in determining that claimant's complaints were not credible." *Id.* (citation omitted).

Likewise, the Ninth Circuit recently criticized ALJs who rejected a claimant's "testimony regarding the intensity, persistence, and limiting effects of his symptoms to the extent that testimony was 'inconsistent with the above residual functional capacity assessment.'" *See Laborin v. Berryhill*, 867 F.3d 1151, 1154 (9th Cir. 2017). The Court explained "this boilerplate language is problematic" and "subverts the way an RFC must be determined relying on credible evidence, including testimony." *Id.* (citing *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012)) As a result, the Ninth Circuit determined "inclusion of [the] flawed boilerplate language" "does not …add anything to the ALJ's determination." *Id.*, 867 F.3d at 1154-55. Thus, where an ALJ includes *only* boilerplate language, the analysis is insufficient to support the ALJ's conclusions. *Id.* at 1155.

The ALJ did not include only the language identified as boilerplate by either the Ninth Circuit or the Seventh Circuit. The ALJ did not merely reject Plaintiff's testimony as inconsistent with the residual functional capacity he identified, but addressed several factors discussed below. Consequently,

---

[3] Pursuant to SSR 96-7p, factors an ALJ should consider include the objective medical evidence; daily activities; location, duration, frequency, and intensity of pain; and treatment received, including the type, dosage, and effectiveness of medication. *See id.*, 1996 WL 374186.

12

the Court finds the ALJ did not err by reciting the boilerplate language in the credibility determination.

2.  Objective medical evidence

In general, "conflicts between a [claimant's] testimony of subjective complaints and the objective medical evidence in the record" can constitute "specific and substantial reasons that undermine . . . credibility." *Morgan v. Comm'r of Social Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999). The Ninth Circuit explained, "While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects." *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); *see also Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005) ("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis"). Because the ALJ did not base the decision solely on the fact that the medical record did not support the degree of symptoms alleged by Plaintiff, the objective medical evidence was a relevant factor in determining Plaintiff's credibility.

However, if an ALJ cites the medical evidence as part of a credibility determination, it is not sufficient for the ALJ to simply state that the testimony is contradicted by the record. *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001) ("general findings are an insufficient basis to support an adverse credibility determination"). Rather, an ALJ must "specifically identify what testimony is credible and what evidence undermines the claimant's complaints." *Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006); *see also Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993) (an ALJ must identify "what evidence suggests the complaints are not credible").

The ALJ observed Plaintiff said that "she need[ed] a walker," but Dr. Van Kirk opined Plaintiff "does not medically require any assistive device." (Doc. 9-3 at 26) As the ALJ noted, Dr. Van Kirk observed that Plaintiff was "able to get up and out of [a] chair and walk around the examination room without the use of her walker or any assistance." (*Id.* at 27) Dr. Van Kirk then opined Plaintiff did "not need to use a walker on a regular basis," though she would "perhaps… benefit by carrying a collapsible cane with her when she is out and about..." (Doc. 9-10 at 103) In addition, the ALJ observed that in December 2015, Dr. Hugh Yang noted Plaintiff had a normal gait "and he did not mention any walker or cane use." (Doc. 9-3 at 27)

13

Because the ALJ met the burden to identify inconsistencies between Plaintiff's testimony and the record—including the observations of Drs. Van Kirk and Yang and the findings of Dr. Van Kirk after the consultative examination—the objective medical record supports the adverse credibility determination. *See Greger*, 464 F.3d at 972; *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995) (holding an ALJ may consider "contradictions between claimant's testimony and the relevant medical evidence").

### 3. Plaintiff's level of activity

A claimant's ability to perform household chores and manage finances may be sufficient to support an adverse finding of credibility. *See Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1175 (9th Cir. 2008); *see also Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005). The Ninth Circuit observed, "Even where … activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment." *Molina v. Astrue,* 674 F.3d 1104, 1113 (9th Cir. 2012).

The ALJ observed that Plaintiff "testified that she is able to help dress her 5-year-old child, help her children with homework, and makes sure they are ready for school the next day, preparing their homework and their clothes." (Doc. 9-3 at 25) He opined these activities "suggest[ed] that the claimant's functional difficulties are not as severe as she alleged." (*Id.*) In addition, the ALJ noted that on a pain questionnaire, Plaintiff reported "her usual daily activities include[d] limited walking distances, light lifting, shopping, and driving limited to approximately 1 mile." (*Id.*) The ALJ opined these activities were "generally consistent with a light residual functional capacity." (*Id.*) Because Plaintiff retained the ability to perform activities of daily living—despite the allegations of disabling back pain— her activity supports the ALJ's determination that her impairments were not as disabling as Plaintiff alleged. *See Stubbs-Danielson,* 539 F.3d at 1175; *Molina,* 674 F.3d at 1113.

### 4. Treatment received

When assessing a claimant's credibility, the ALJ may consider "the type, dosage, effectiveness, and side effects of any medication." 20 C.F.R. §§ 404.1529(c), 416.929(c). When an impairment "can be controlled effectively with medication," it cannot be considered disabling. *Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006).

Plaintiff does not challenge, or even acknowledge, the ALJ's findings concerning the effectiveness of the treatments she received. (*See generally* Doc. 13 at 6-15) However, as the ALJ noted, Plaintiff's physicians repeatedly reported that her pain "improved" and was relieved by her pain medication. (*See* Doc. 9-3 at 26) The ALJ observed:

> The claimant reported that her back pain had improved in May 2013 (Exhibit 76F/41). During her next appointment in July 2013, she continued to report some mild improvement after her spinal injection 2 weeks prior and Matthew Easton, D.O. wrote that the claimant's back pain status was "improved" (Exhibit 6F/38). In August 2013, the claimant stated that her back pain is 60 to 70% better with no numbness or tingling (Exhibit 6F/60) Dr. Easton noted that the claimant's MRI showed only mild disc bulge at L4-L5 and questionable mild impingement on the existing nerve root on the left L5-S1 (Exhibit 6F/60). He continued to write that the claimant's status was "improved" (Exhibit 6F/35).
>
> The claimant continued to report improvement in September 2013, stating that her back pain was approximately 30% better and Dr. Easton wrote her status as "improved" (Exhibit 6F/29). During her following appointments, Dr. Easton continued to write that the claimant's back pain status was "improved" (Exhibit 6F.14, 21). In December 2014, Stephanie Voyles, M.D. wrote that the claimant's back pain symptoms were relieved by pain medications/drugs (Exhibit 13F/67). Throughout the subsequent treatment, Dr. Voyles repeatedly wrote that the claimant's symptoms are relieved by pain medication/drugs (Exhibit 13F/43, 55, 61). In September 2015, the claimant stated that the hydrocodone helps her back pain and that she has not been taking her baclofen, gabapentin, and naproxen much (Exhibit 13F/25), which tends to suggest that her symptoms had improved.

(Doc. 9-3 at 26) Thus, as the ALJ determined, the medical record shows many doctors opined Plaintiff's symptoms had improved and were relieved by the treatment she received.

Where such treatments such as those Plaintiff received are effective, the ALJ's findings regarding the effectiveness of treatment support an adverse credibility determination. *See Jones v. Comm'r of Soc. Sec.,* 2014 WL 228590 at *7-10 (E.D. Cal. Jan. 21, 2014) (the ALJ properly found that the effectiveness of the plaintiff's treatment—physical therapy, anti-inflammatory and narcotic medications, a TENS unit, occasional epidural steroid injections, and massage therapy—diminished the plaintiff's credibility because the "[t]he evidence of record supports the ALJ's finding that plaintiff's symptoms were well-controlled"); *Traynor v. Colvin*, 2014 WL 4792593 at *9 (E.D. Cal. Sept. 24, 2014) (evidence that the claimant's symptoms were managed with "prescription medications and infrequent epidural and cortisone injections" was sufficient for the ALJ to discount the plaintiff's testimony regarding the severity of impairment). Moreover, when a claimant does not "follow a

prescribed course of treatment," the Ninth Circuit determined such actions "can cast doubt on the sincerity of the claimant's pain testimony." *Fair*, 885 F.2d at 603.

Because Plaintiff and her physicians repeatedly indicated that her pain was improving, and Plaintiff reported that she was not "taking her baclofen, gabapentin, and naproxen much," the record supports the ALJ's conclusion that Plaintiff's pain was controlled with medication. *See Jones,* 2014 WL 228590 at *7-10; *Overs v. Astrue,* 2012 U.S. Dist. LEXIS 124695 at *38 (S.D. Cal. July 16, 2012) ("An ALJ may rely on evidence of a claimant's failure to take medication when questioning the claimant's credibility"). Thus, the effectiveness of the treatment Plaintiff received—which was not challenged by Plaintiff—supports the adverse credibility determination.

### 5. Observations of the ALJ

The ALJ observed that Plaintiff "moved with ease during the hearing," which, he believed undermined Plaintiff's assertion that she needed a walker. (Doc. 9-3 at 25) Plaintiff does not address the ALJ's observation, which is a proper factor for a credibility analysis. *See Nyman v. Heckler*, 779 F.2d 528, 531 (9th Cir. 1986) (when an ALJ includes personal observations of a claimant during the hearing, the decision is not improper if other evidence supports the determination. *Nyman v. Heckler*, 779 F.2d 528, 531 (9th Cir. 1986); *Drouin v. Sullivan*, 966 F.2d 1255, 1258-59 (9th Cir. 1992) (observations of ALJ during the hearing, along with other evidence, is substantial evidence for rejecting testimony).

Because the ALJ set forth other clear and convincing reasons for finding Plaintiff's subjective complaints lacked credibility, the ALJ properly incorporated his personal observation into the adverse credibility determination

### 6. Lack of candor

The ALJ also questioned Plaintiff's credibility due to her responses concerning her work after the alleged onset date. (Doc. 9-3 at 25) The ALJ observed: "The claimant did not remember the work she did after being prompted, which tends to suggest she may be less than credible." (*Id.*)

An ALJ may consider "ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid." *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996) Clearly,

the ALJ identified inconsistencies between Plaintiff's subjective complaints and the record, and inconsistencies between her statements and presentation to physicians. Her lack of candor concerning the work performed after her alleged onset date also supports the adverse credibility determination. *See Smolen*, 80 F.3d at 1284; *see also Thomas*, 278 F.3d at 959 (finding the ALJ did not err by inferring that a claimant's lack of candor "carries over to her description of physical pain").

## **CONCLUSION AND ORDER**

The ALJ properly set forth findings "sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds." *Moisa v. Barnhart*, 367 F.3d 882, 885 (9th Cir. 2004); *see also Thomas*, 278 F.3d at 958. Indeed, several factors discussed by the ALJ were not challenged by Plaintiff.

Because the ALJ applied the proper legal standards, the determination that Plaintiff is not disabled must be upheld by the Court. *Sanchez*, 812 F.2d at 510. Accordingly, the Court **ORDERS:**

1. The decision of the Commissioner of Social Security is **AFFIRMED**; and
2. The Clerk of Court **IS DIRECTED** to enter judgment in favor of Defendant Nancy Berryhill, Acting Commissioner of Social Security, and against Plaintiff Amanda Lopez-Frausto.

IT IS SO ORDERED.

Dated: **February 1, 2019**  /s/ Jennifer L. Thurston
UNITED STATES MAGISTRATE JUDGE